**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

BENJAMIN A. JUAREZ,

      An individual,

Plaintiff.

v.

CITY AND COUNTY OF DENVER,
DEPARTMENT OF PARKING AND TRANSPORTATION,

      A municipal government entity,

Defendant.

---

**COMPLAINT AND REQUEST FOR JURY TRIAL**

---

Benjamin A. Juarez [Juarez], Plaintiff, through his attorney, Steven L. Murray of Murray Law, LLC, submits his Complaint and Request for Jury Trial against Defendant, the City and County of Denver, Department of Parking and Transportation [collectively referenced as the City or Defendant].

Juarez, a former City employee, served as Director of Parking at the Denver International Airport [DIA].

This case is an employment discrimination and retaliation action under Title VII of the Civil Rights Act of 1964, as amended.

Juarez seeks legal and equitable relief for Defendant's intentional and unlawful:

(1) Retaliation against him by taking material adverse actions against him

1

because he engaged in lawful participation in protected equal employment opportunity activities, meaning, - his repeated complaints to Defendant about the City's discriminatory pay practices and retaliation against him, and his complaints about discriminatory pay practices for other minority employees;  and

(2) Discrimination against him based on his national origin and color concerning his salary, the terms and conditions of his employment, and his constructive discharge from employment.

## I.  <u>PARTIES</u>

1.  Juarez is a United States citizen and resident of Aurora, Colorado.

2.  Defendant, the City and County of Denver, is a municipal government entity conducting business in Denver, Colorado.

3.  Juarez worked for Defendant in Denver, Colorado.

4.  At all times in issue, Juarez and Defendant lived, worked, and conducted business within this Court's Judicial District.

## II.  <u>JURISDICTION AND VENUE</u>

5.  Jurisdiction is asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e, 2000e-5, and 2000e-5(f)(1)(3), *as amended,* and the Civil Rights Act of 1991, 42 U.S.C. Section 1981a (a)(1), (b)(2)(3)(D), (c)(1)(2), and (d)(1)(A)(2).

6.  This Court has jurisdiction under 28 U.S.C. Sections 1331,1343(a)(3)(4).

7.  Juarez was an employee of Defendant, and Defendant was an employer of Juarez under Title VII.

8.  The claims in issue, including all alleged unlawful employment actions, arose

in the Judicial District of this Court.

9.   Venue is proper in this Court under 28 U.S.C. Section 1391(a)(1)(2), (b)(1)(2), (c)(1)(2), and 42 U.S.C. Section 2000e-5(f)(3).

### III.   **ADMINISTRATIVE PROCEDURES**

10.   Before filing this action, Juarez timely, properly, and lawfully exhausted all required administrative prerequisites, procedures, and remedies.

11.   Juarez filed a timely charge of retaliation and national origin and color discrimination, all actions violating Title VII, with the United States Equal Employment Opportunity Commission. [EEOC] [Charge No. 541-2022-00448].

12.   On December 22, 2022, the EEOC mailed a Notice of Right to Sue letter to Juarez. This action is timely filed because it is filed within ninety days of Juarez's receipt of the Notice of Right to Sue letter.

### IV. **GENERAL ALLEGATIONS**

**A.   Overview**

13.   Defendant employed Juarez from November 2017 through March 4, 2022.

14.   Juarez worked for Defendant in the Parking and Transportation Department at DIA.

15.   In 2017, Juarez began his employment with Defendant as the Manager of Parking and Analysis.

16.   Juarez, a male, is thirty-seven years of age. He is married and the father of two young sons.

17.   Juarez was born in Belize, a nation in Central America.

18.  Juarez identifies his national origin as Hispanic and/or Mestizo. Mestizo is 50% Hispanic and 50% Mayan Indian.

19.  Juarez is a person of color: he identifies as Brown, non-White.

20.  Juarez became a naturalized United States citizen in 2012.

21.  Juarez earned a Bachelor of Arts degree in Mathematics and Computer Science from Regis University in May 2007 and a Master's in Business Administration degree with an emphasis in Finance and Accounting from Regis University in December 2011.

22.  Juarez, from on or about March 7, 2022, through the present, has served as a member of the Financial Management Staff with a new employer,

23.  At all times in issue, Winfred "Herald" Hensley, a White male, served as Senior Vice President in charge of Defendant's Parking and Transportation Department [Department] at DIA.

24.  Hensley served as Juarez's direct supervisor for Juarez's entire period of employment with Defendant.

25.  In June 2020, Denver Mayor Michael Hancock, a Black male, appointed Phillip A. Washington [Washington], a Black male, as the Chief Executive Officer [CEO] for DIA.

26.  On or about July 6, 2022, President Joseph Biden nominated Washington as the Administrator of the Federal Aviation Administration. [FAA].

27.  On or about January 3, 2023, President Biden renominated Washington as the Administrator of the FAA.

28. Steve Jaquith [Jaquith], a White male, served as Chief Operating Officer [COO] at DIA.

29. Chris McLaughlin, a White male, served as the COO at DIA before Jaquith served in the position.

30. Laura Coburn [Coburn], a White female, served as Defendant's Director of the Office of Human Resources [HR] at DIA.

31. Cristal DeHerrera served as the Chief of Staff for Denver's Mayor at DIA

**B. Background: Airport Audit**

32. In August 2021, the City and County of Denver Auditor completed an audit of the controls and management of the ABM Parking Services, Inc. Shuttle Bus Management Services Agreement [Shuttle Bus Contract]. The Audit covered February 2017 through December 2020. The Audit found deficiencies in the Department's oversight and tracking of the Contract.

33. For the entire period of the Audit, from February 2017 through December 2020, Hensley served as the Contract Administrator for the Shuttle Bus Contract.

34. In September/October 2019, Hensley became the Senior Vice President in charge of the Department's work at DIA, and he continued serving as the Contract Administrator for the Shuttle Bus Contract.

35. Defendant established the terms and administration of the Contract before Defendant hired Juarez.

36. In October 2018, while Juarez was serving as Manager of Parking and Analysis, Defendant temporarily assigned him to the Transportation Systems Unit

because the Transportation Systems Director retired. This Unit includes the Shuttle Bus Contract.

37. Defendant assigned the transportation duties to Juarez in addition to his duties as the Manager of Parking and Analysis.

38. Juarez's work on the Shuttle Bus Contract was only from October 2018 through December 2020 of the Audit period, which began in February 2017; while Hensley remained Defendant's leading manager and official of the Shuttle Bus Contract for the entire Audit period.

**C.  Juarez's Denver Employment**

- ***2020***

39. In February 2020, Defendant promoted Juarez to Director of Parking, with the official job classification of Airport Commercial Director.

40. After Juarez's promotion, Hensley hired Brian Kramer, a White male, as an Airport Commercial Director.

41. Like Juarez, Kramer was a Director at DIA, the Director of Commercial Transportation, and his official job classification was Airport Commercial Director.

42. Defendant and Hensley hired Kramer at a starting salary of $138,000.00, $18,000.00 more than Juarez's salary of $120,000.00.

43. In December 2020, Hensley, and Coburn, Defendant's HR Director at DIA, and McLaughlin, the former COO at DIA, directed Juarez to manage Brian Pokorny [Pokorny], a City employee at DIA, out of employment with the Department, by using an unjust performance improvement plan and subsequent Notification of

6

Contemplation of Discipline.

44.  Juarez was Pokorny's direct supervisor.

45. On or about December 8, 2020, Hensley told Juarez: he, Coburn, and McLaughlin would support Juarez if he would get on board and "get that nutcase out of here," referring to driving Pokorny out of the Department.

46.  Juarez refused Hensley's directive to drive Pokorny out of the Department.

- *2021*

47. In May – June 2021, Juarez complained to Hensley and Defendant about the discriminatory pay disparity between his salary and the higher salary paid to Kramer.

48.  Juarez's complaints about the discriminatory pay disparity addressed: (1) Juarez is Hispanic and a person of color, and Kramer is a White male; (2) Kramer and Juarez held the same official job classification, Airport Commercial Director; and (3) Juarez performed more complex duties than Kramer.

49.  Hensley promised Juarez he would investigate the subject of Juarez's complaint – the discriminatory pay disparity in Juarez's complaints; however, the investigation did not occur.

50.  Neither Hensley nor Defendant ever provided Juarez with the results of any investigation of the reason for the pay disparity between him and Kramer.

51.  On or about May 13, 2021, Juarez informed Hensley and the people reporting to Juarez that Washington would be announced as the incoming CEO of DIA.

52.   On or about May 17, 2021, Juarez advocated for John Doe,[1] a Black male serving as a Landside Services Supervisor, for a promotion to a Business Operations Administrator position in the Department at DIA.

53.   Juarez was Doe's second-level supervisor.

54.   Initially, Hensley and Defendant refused to promote Doe, questioning Doe's qualifications for the job.

55.   Juarez continued advocating for Doe's promotion.

56.   On or about May 18, 2021, Hensley stated: "Yes, let's hire a Black guy to sit up front, so it looks good when Phil [Washington] comes down to our office."

57.   Later, on or about the same day, May 18, 2021, Hensley repeated the same offensive language about "hiring a black guy" to "Ms. F. Smith," [2] a White female and Department employee.

58.   "Ms. F. Smith": (1) served as Doe's first-level supervisor; (2) served as hiring manager for Doe's new position; and (3) and reported directly to Juarez.

59.   In a subsequent conversation, after Doe accepted the promotion, Ms. F. Smith heard Hensley state: bringing Doe on board would make him look good in front of his boss [Washington] because Doe is Black/African American.

60.   Ms. Smith expressed to Defendant that Hensley may have thought his comment about it "looking good to have a black man up front" was funny, but it was not amusing to her.

---

[1] Doe is a pseudonym.
[2] Smith is a pseudonym.

61.    Eventually, Defendant promoted Doe and gave him a 7% salary increase.

62.    On or about the same time Defendant gave Doe a 7% raise, it promoted Frank Keith, a White male employee, to Landside Services Supervisor and gave him a raise in salary from $54,000.00 to $74,000.00, an increase of about 37%.

63.    After Doe's promotion, Juarez complained to Hensley, Coburn, Jaquith, and Washington about the discriminatory pay provided to Doe.

64.    In July 2021, Juarez: (1) again complained to Hensley, his direct supervisor, about the discriminatory salary disparity between his salary and Kramer's salary; and (2) complained to Hensley about the discriminatory pay practices to other minorities in the Department based on national origin, color, race, and sex.

65.    Juarez complained to Hensley that the Department was not following Mayor Hancock's Executive Order mandating racial and social justice and pay equity.

66.    Juarez complained to Hensley about disparities created by Defendant in the Department through hiring While males at salaries significantly higher than the salaries and promotion increases paid to Department employees serving and performing jobs with duties equal to or greater than the duties to be performed by the newly hired White males.[3]

67.    In September 2021, Juarez emailed Jaquith, a White male and the COO at DIA, informing Jaquith he had sensitive information to share with him.

---

[3] Juarez complaints about salaries and pay for minority employees in the Department included complaints about salaries/pay to: (1) Doe, a Black male; (2) Fatimah Jones, a Black female; (3) Carey Hawk, a Native American male; (4) Christian Marquez, a Hispanic male; (5) Carolee Harmes, a White female; and (6) Amy Rodie, a White female.

68.  Jaquith did not deal with the substance of Juarez's request, and he forwarded Juarez's complaint to Defendant's HR Department at DIA.

69.  On or about September 17, 2021, Juarez complained to Coburn, Director of the Defendant's HR Department at DIA, about the: (1) discriminatory salary disparity between his salary and Kramer's salary; and (2) discriminatory pay inequities for other minority employees in the Department based on national origin, color, race, and sex, which Juarez had previously shared with Hensley.

70.  In response to Juarez's complaints, Coburn told Juarez: "you're being paid equitably."

71.  On the same day, on or about September 17, 2021, Juarez informed Hensley of his complaints to Coburn about the discriminatory pay disparity he was confronting about Kramer's salary and the discriminatory pay for other minority Department employees.

72.  On or about September 24, 2021, Juarez complained to Coburn and Gina Splatt, Senior Classification and Compensation Analyst in the HR Department, about the discriminatory pay disparity he was confronting and the discriminatory pay for other minority Department employees.

73.  On October 19, 2021, Jaquith, a White male and the COO at DIA, served Juarez with a Notification of Contemplated Discipline dated October 6, 2021.

74.  The Notification alleges Juarez engaged in misconduct.

75.  Juarez did not engage in the alleged misconduct in the October 2021 Notification.

76.   The October 2021 Notification informed Juarez he could be subject to further discipline up to and including dismissal.

77.   The October 2021 Notification and threat of further discipline up to and including dismissal created fear in Juarez for his financial and job security and potential harm to his professional career.

78.   Before the Notification, Juarez had never been subjected to any proposed or imposed disciplinary action during his employment with Defendant.

79.   On the next day, on or about October 20, 2021, Defendant changed Juarez's position duties without informing him of the change or permitting him to discuss the change.

80.   On October 28, 2021, Juarez filed a response to the Notification of Contemplated Discipline. Juarez, in which he: (1) denies engaging in any misconduct; and (2) complains about retaliation against him "for advocating proper controls in setting wages within Parking and Transportation that are creating economic disadvantages specifically for minorities including myself."

81.   Defendant issued its Disciplinary Decision on November 19, 2022, pursuant to the Notification of Contemplated Discipline.

82.   The Disciplinary Decision: (1) imposed discipline on Juarez: a written reprimand; and (2) states: "Further misconduct may be cause for additional disciplinary action, up to and including dismissal."

83.   The November 2021 Disciplinary Decision and the threat of further discipline up to and including dismissal created increased fear in Juarez for his financial and job

security and potential harm to his professional career.

84.    Juarez, after the Disciplinary Decision in November 2021, complained to Washington, DIA's CEO, about the: (1) discriminatory pay disparity between him and Kramer; (2) discriminatory pay practices for other minority employees in the Department, including people he supervised; (3) retaliation he was confronting; and (4) written reprimand.

85.    On or about December 3, 2021, Juarez filed a Dispute Resolution Request with the Career Service Authority with a copy to Jaquith and Washington. In the Request, Juarez complained Defendant was retaliating against him because he advocated for proper controls in setting wages within the Parking and Transportation Department creating economic disadvantages specifically for minorities, including himself.

86.    Also, on December 3, 2021, Juarez filed a Career Services Mediation Request Form in which he again stated Defendant was retaliating against him because he advocated for proper controls in setting wages within the Department, creating economic disadvantages specifically for minorities, including himself.

87.    On December 7, 2021, four days after Juarez filed the Dispute Resolution Request and the Career Services Mediation Request Form, Defendant placed Juarez on Investigatory Leave.

88.    Despite Juarez's request, Defendant refused to provide him any written reason it placed him on Investigatory Leave.

89.    Defendant ordered Juarez, while on investigatory leave: (1) not to report to

the workplace; (2) to return his laptop, work phone, badge, and keys; (3) not to access any City computers or computer systems owned or operated by the City or any of its agencies, departments, officials or employees; (4) not to discuss the investigatory leave or work-related matters with "anyone at the [City and County of Denver];" (6) to remain at home during regular business hours and not perform any work; and (7) to be available by telephone during normal business hours.

90.   Defendant's action placing Juarez on investigatory leave and the harsh terms of his leave, caused increased fear in Juarez for his financial and job security and potential harm to his professional career.

91.   Juarez was on investigatory leave from on or about December 7, 2021, through December 15, 2021.

92.   Shortly after Juarez's return from investigatory leave, Defendant, on or about December 21, 2021, provided Juarez with a second Notification of Contemplation of Discipline.

93.   Defendant, in the Notification: (1) alleged Juarez engaged in misconduct concerning recording conversations in the workplace, and (2) stated further discipline may be taken up to and including dismissal.

94.   Juarez did not engage in misconduct in the workplace concerning recording conversations.

95.   Defendant allowed at least four White employees to use recordings in the workplace while denying Juarez the same terms, conditions, and employment privileges under the same circumstances.

96.   The December 2021 second Notification of Contemplation of Discipline caused greater fear in Juarez for his financial and job security and potential harm to his professional career.

97.   On or about December 21, 2021, Juarez: (1) complained to Defendant, through an Official Career Service Workplace Grievance Form, about retaliation and discrimination against him for complaining about pay discrimination against him; (2) complained about Defendant's discriminatory pay practices to minorities in hiring and promotion opportunities in the Department, and (3) informed Defendant about his initial contact with the EEOC to file a complaint.

98.   On or about December 31, 2021, Defendant, through Hensley, provided Juarez with a performance appraisal/annual review.

99.   The December 2021 performance appraisal/annual review included a summary rating of: "Development Needed," the lowest evaluation rating Juarez received in his employment with Defendant.

100. In the December 2021 performance appraisal/annual review, Defendant and Hensley inaccurately described Juarez's work relating to the Audit in an inaccurate, negative, and punitive manner.

101. Defendant and Hensley gave Juarez the December 2021 performance appraisal rating after he had submitted multiple complaints about retaliation and pay disparity discrimination against him and discriminatory pay practices against other minority employees in the Department.

● *2022*

102. On January 4, 2022, Juarez and his previous attorney appeared at a Contemplation of Discipline meeting to respond to the December 21, 2021, Notification of Contemplation of Discipline.

103. On January 11, 2022, Juarez's prior attorney provided Defendant, through Jaquith, with Juarez's response to the December 21, 2021, Notification of Contemplated Discipline.

104. Juarez paid for his prior attorney's legal services for attending the January 4, 2022, meeting, and preparing the response to the Notification.

105. On January 28, 2022, Defendant, through Jaquith, issued its Disciplinary Decision under the Notification on December 21, 2021.

106. Defendant, in the Disciplinary Decision, determined "no discipline was warranted.

107. On or about February 14, 2022, Juarez emailed his complaint to Washington, Hensley, Jaquith, and Cristal DeHerrera, Chief of Staff for Mayor at DIA, complaining about: (1) Hensley's race-based comments: "Yes, lets hire a black guy to sit up front so it looks good when Phil [Washington] comes down to our office;" and (2) Hensley perpetuating a culture of discrimination and retaliation within the Parking and Transportation Department.

108.    On or about February 18, 2022, Juarez sent a second email with a recording to Mayor Michael Hancock, Washington, Jaquith, and Cristal DeHerrera. Juarez provided evidence of Hensley's comments and complained again about the

Department's culture of discrimination and retaliation. The recording included Ms. F. Smith confirming she heard Hensley make the race-based comments previously discussed.

109.    On February 23, 2022, Lisa Korock, an employee in Defendant's HR Department, interviewed Juarez and assured him that an investigation would occur with his direct reports about Hensley's statements and conduct.

110.    Korock and the HR Department interviewed only one of Juarez's reports. The interview was on February 24, 2022.

111.    Hensley returned from investigatory leave on February 28, 2022.

112.    After Hensley returned from investigatory leave, Juarez complained to Korock about his fear of retaliation by Hensley against him and against the people who directly reported to Juarez.

113.    Juarez asked Korock if Defendant's investigation of Hensley had been completed, and she told Juarez the Defendant would inform him when the investigation of Hensley was completed.

114.    Korock told Juarez to inform her of any retaliation from Hensley, however, she blocked Juarez's email address around February 28, 2021.

115.    Because of Korock's action blocking Juarez's email, he could not follow up with her about the status of the investigation, including her failure to follow up with interviews with his direct reports or report any further retaliation or discrimination from Hensley.

116.    Defendant never informed Juarez that the investigation of Hensley was

conducted and/or completed.

117.    Juarez gave his resignation notice to Defendant on February 22, 2022.

118.    Juarez's last workday was March 4, 2022. On that day, he again announced his resignation in a memorandum sent to many City employees and officials, including but not limited to Mayor Hancock, Washington, Jaquith, Hensley, Korock, and DeHerrera.

119.    Defendant's retaliatory and discriminatory actions created an intolerable working environment for Juarez and subjected him to a constructive discharge.

120.    Upon information and belief, Defendant replaced Juarez with William McDonald, a White male with a high school education, and paid the employee $145,000.00, an amount higher than Juarez's salary by about $25,000.00.

121.    During Juarez's employment with Defendant, Defendant did not: (1) discipline Hensley for his racially offensive comments; (2) investigate or remedy the pay disparity between Juarez's salary and Kramer's salary, or the discriminatory pay practices harming the interests of other minority employees in the Department, about whom Juarez had explicitly and repeatedly complained about to Defendant; (3) investigate or remedy the retaliation he confronted and about which he had complained; (4) remedy the unwarranted notifications of contemplated discipline issued by Defendant against Juarez; (5) remedy the imposed discipline of a written reprimand on Juarez; (6) remedy the investigatory leave imposed on Juarez; or (7) remedy the low-performance rating given to Juarez by Hensley, in which Hensley improperly attributed deficiencies in the Audit to Juarez's conduct.

**D.     Defendant Addressed Discrimination & Retaliation Issues Only After Juarez's Employment Ended**

122.    During Juarez's employment with Defendant, Defendant did not address the many topics he raised in his complaints, including but not limited to: (1) Defendant's retaliation against him; (2) Hensley's discriminatory and retaliatory conduct and race-based comments; (3) discriminatory pay to Juarez and minority employees in the Department; (4) the culture of employee perceptions of discrimination and retaliation; and (5) discriminatory terms and conditions imposed on Juarez and other minority employees.

123.    Defendant, only after subjecting Juarez to a constructive discharge and separation from employment, and after ignoring his complaints, addressed the above issues for employees other than Juarez, including terminating Hensley's employment.

124.    Juarez's sent his March 4, 2022, memorandum to Defendant's officials and employees at 8:06 a.m.

125.    Jaquith, later in the evening of the same day, March 4, 2022, sent a memorandum to the Parking and Transportation Department and many City officials, including Washington, Coburn, DeHerrera, Hensley, and others, on "Listening Sessions."

126.    In his March 4, 2022 memorandum, Jaquith states: "Creating a culture that embodies our values, supports our employees, and builds a culture based on trust is important to me and our DEN team. I recognize that there may be recent activity within the division that created some concerns. . .."

127.    Also, Jaquith states: "DEN has zero tolerance for any inappropriate,

discriminatory behavior regardless of position. I look forward to growing with you and hearing from your ideas on how we can move forward together."

### E.    Defendant Terminates Hensley's Employment

128.    Defendant fired Hensley on May 5, 2022, two months after Defendant constructively discharged Juarez.

129.    Jaquith wrote the dismissal letter to Hensley, in which Jaquith states to Hensley: "Many employees strongly believe harassment, discrimination, retaliation, and a hostile work environment exist within the Parking and Transportation Department. The culture of the Parking and Transportation Department is a direct reflection of your poor leadership and judgment; ineffective communication, delegation and follow up; and lack of accountability. You have lost the respect of your subordinates. The environment is indeed perceived as toxic."

130.    Also, Jaquith's dismissal letter to Hensley states that in the contemplation of discipline meeting for Hensley, Hensley "blamed the lack of trust and pervasive perceptions of discrimination, pay inequities, and retaliation solely on Mr. Juarez."

131.    Moreover, Jaquith, in the dismissal letter, states that Hensley told him: "Juarez twists words, hears what he wants to hear, and draws conclusions based on his misinterpretation of the facts."

132.    Further, Jaquith states: while it is true "Juarez's emails were among the first to express concerns of discrimination, retaliation, and pay inequities in Parking and Transportation, they became the catalyst for many other employees in the department to find the courage to speak up about their own similar experiences and perceptions."

19

133.    As a direct, foreseeable, and proximate result of Defendant's unlawful, intentional discrimination and retaliation complained of herein, Juarez suffered compensatory damages, injuries, and losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

134.    As a direct, foreseeable, and proximate result of Defendant's unlawful, intentional discrimination and retaliation complained of herein, Juarez suffered economic damages and losses, including but not limited to lost earnings and potential earnings, including an actual loss of wages, income, benefits, diminution of earning capacity, actual and/or potential retirement benefits, and future pecuniary losses.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM

### [Unlawful Retaliation in Violation of Title VII]

135.   Juarez incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

136.   This claim is for unlawful retaliation in violation of Title VII, 42 U.S.C. Section 2000e-3 (a).

137. Title VII provides it is an unlawful employment practice for an employer to discriminate against any of its employees because the person opposed any practice made an unlawful employment practice by the Act, or because the individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act. 42 U.S.C. Section 2000e-3(a).

138. Juarez's protected Title VII activities include his informal and formal complaints to Defendant's managers, supervisors, and officials, the Career Service Board, his complaints in response to Defendant's Notifications of Contemplated Discipline, his contact with the EEOC, and his opposition to conduct prohibited by Title VII, including discrimination and retaliation.

139. Juarez's protected activities include his: (1) complaints about national origin and color discrimination against him; (2) his complaints on behalf of other minority employees in the Department about race, national origin, and sex discrimination; (3) complaints about Hensley's race-based comments; (4) complaints of retaliation against him for having complained about discrimination against him and other minority employees in the Department; (5) opposition to discriminatory and retaliatory conduct prohibited by Title VII; and (6) initial contact with the EEOC.

140. At all times, Defendant was fully aware of Juarez's protected Title VII activities. Defendant's officials taking the material adverse actions against him, including but not limited to Hensley, Jaquith, Coburn, and Washington, were fully aware of Juarez's protected Title VII activities.

141. Defendant retaliated against Juarez by subjecting him to continual, intentional, cumulative, increasingly severe, and materially adverse employment actions that might deter a reasonable person from engaging in protected activity.

142. Defendant's series of adverse material actions include but are not limited to:

(1) Defendant refused to investigate his complaints about the discriminatory pay disparity between Juarez's salary and Kramer's salary.

(2)  Defendant refused to adjust the pay disparity between Juarez's salary and Kramer's salary.

(3)  Defendant issued the Notification of Contemplated Disciplinary Action to Juarez, dated October 6, 2021.

(4)  Defendant threatened Juarez in the Notification of Contemplated Discipline, dated October 6, 2021, by informing him he could be subject to further discipline up to and including dismissal.

(5)  Defendant imposed the disciplinary sanction of a written reprimand dated November 19, 2021, on Juarez.

(6)  In the Decision imposing the reprimand, Defendant informed Juarez that further misconduct may be cause for additional disciplinary action, up to and including dismissal.

(7)  Defendant provided Juarez with the lowest performance rating he received during his employment with the City, the rating of "Development Needed", in the evaluation for January 1, 2021 – December 31, 2021.

(8)  Defendant and Hensley, in Juarez's 2021 evaluation, (a) inaccurately and unjustly attributed to him the deficiencies in the Audit; and (b) did not accept accountability for Hensley's failures which contributed to the poor outcome of Audit and unfairly attributed Audit deficiencies to Juarez.

(9)  Defendant placed Juarez on Investigatory Leave, on December 7, 2021, and imposed punitive, unwarranted conditions on him during the leave.

(10) Defendant issued the Notification of Contemplated Disciplinary Action,

dated December 21, 2021, on Juarez.

(11) Defendant threatened Juarez with further discipline up to and including dismissal in the Notification of Contemplated Discipline, dated December 21, 2021.

(12) Defendant subjected Juarez to disciplinary and conduct standards about recording in the workplace while not subjecting White employees to the same standards.

(13) Defendant refused to investigate Hensley for his discriminatory comments.

(14) Defendant refused to investigate or remedy his numerous complaints of retaliation, national origin and color discrimination against him, and discrimination against other minority employees in the Department.

(15) Defendant changed Juarez's duties without informing him of the change.

(16) Korock, an HR employee, blocked Juarez from sending her emails, including messages about retaliation and discrimination.

(17) Defendant constructively discharged Juarez from employment.

(18) Upon information and belief, Defendant filled Juarez's past position with a less qualified White male and paid the White male a salary greater than Defendant paid Juarez.

143.  A causal connection exists between Juarez's protected activities and the unlawful materially adverse employment actions taken by Defendant against Juarez.

144.  Defendant, contemporaneously with, and/or right after Juarez's protected

activities, engaged in an intentional, calculated, and purposeful campaign of unlawful retaliation, subjecting him to intentional, cumulative, materially adverse actions.

145.  The intentional, unlawful retaliation was created, perpetrated, and/or tolerated by Defendant's officials, managers, and employees.

146.  Defendant's treatment of Juarez, considered in its totality and in a cumulative manner, as outlined in the above paragraphs of this claim and Complaint, is direct, intentional, and materially adverse action constituting unlawful retaliation and discrimination prohibited by Title VII.

147.  Defendant's treatment of Juarez constitutes (1) unlawful intentional retaliation and discrimination in violation of 2000e-3(a); and (2) intentional, unlawful discriminatory practices in violation of 42 U.S.C. Section 1981a (a)(1), (b)(2)(3), (d)(1) (2).

## SECOND CLAIM
### [National Origin Discrimination: Pay Disparity]

148.  Juarez incorporates all previous paragraphs and reasserts the prior paragraphs herein.

149.  This claim addresses Defendant's discriminatory treatment of Juarez concerning Defendant's conduct and decisions in paying him less than one or more White employees performing positions with the same title and equal or lesser skills.

150.  Title VII forbids Defendant from: (1) discriminating against any individual regarding terms, conditions, or privileges of employment, because of such individual's national origin or color, 42 U.S.C. Section 2000e–2(a)(1); and (2) limiting, segregating,

or classifying any employee in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's national origin or color. 42 U.S.C. Section 2000e–2(a)(2).

151. Juarez was an excellent performer with Defendant.

152. Juarez belongs to a protected Title VII class because of his national origin.

153. Juarez identifies his national origin as Hispanic and/or Mestizo.

154. Kramer, a White male, is neither a member of Juarez's protected class nor a Title VII protected class.

155. Defendant, through Hensley, hired Kramer to work in the same position classification as Juarez and paid him an annual salary of $18,000.00 more than it paid to Juarez.

156. Juarez and Kramer were both Directors at DIA.

157. Juarez and Kramer both held the official job classification as Airport Commercial Directors.

158. Juarez made multiple complaints to Defendant about the pay disparity between him and Kramer.

159. Juarez's position required him to perform more complex duties than Kramer in the same position.

160. Juarez was qualified for his position, and he successfully performed his duties.

161. Defendant intentionally discriminated against Juarez because of his national

origin by (1) paying Kramer a salary greater than the salary Defendant paid to Juarez; (2) not investigating the pay disparity between Juarez and Kramer; and (3) not adjusting Juarez's salary to an amount equal to or above Kramer's salary.

162. Defendant's and Hensley's actions occurred under the circumstances giving rise to an inference of discrimination.

163. Defendant found that a culture of discrimination existed under Hensley.

164. Hensley engaged in discriminatory conduct against minorities, including but not limited to his offensive race-based comments previously addressed.

165. Hensley protected Kramer's interests about discrimination issues.

166. During Juarez's employment, a Black female employee of the Department filed a racial discrimination complaint/grievance/charge about Kramer's conduct toward her.

167. Jaquith found Hensley did not hold Kramer adequately accountable for his conduct concerning this race discrimination claim.

168. To the extent Defendant has any justifications for the pay disparity between Juarez and Kramer, the justifications are unworthy of credence, and Defendant did not act for any asserted non-discriminatory reasons.

169. Defendant's treatment of Juarez constitutes (1) unlawful intentional discrimination based on national origin in violation of Title VII. 42 U.S.C. Section 2000e–2(a)(1)(2); and (2) intentional, unlawful discriminatory practices in violation of 42 U.S.C. Section 1981a (a)(1), (b)(2)(3), (d)(1) (2).

**THIRD CLAIM**

**[National Origin Discrimination – Terms and Conditions]**

170. Juarez incorporates all prior paragraphs of this Complaint and reasserts the prior paragraphs herein.

171. Juarez's belongs to a protected Title VII class because of his national origin.

172. Defendant intentionally discriminated against Juarez because of his national origin by taking continual, intentional, cumulative, and increasingly severe, adverse, and discriminatory employment actions, including but not limited to the eighteen adverse employment actions in Juarez's First Claim for Relief.

173. Defendant took the adverse employment actions against Juarez because of his national origin.

174. Defendant's actions occurred under circumstances giving rise to an inference of discrimination.

175. Defendant's justifications for the adverse employment actions are unworthy of credence and did not act for any asserted non-discriminatory reasons.

176. Defendant's treatment of Juarez constitutes (1) unlawful intentional discrimination based on national origin in violation of Title VII. 42 U.S.C. Section 2000e–2(a)(1)(2); and (2) intentional, unlawful discriminatory practices in violation of 42 U.S.C. Section 1981a (a)(1), (b)(2)(3),(d)(1) (2).

**FOURTH CLAIM**
**[Color Discrimination: Pay Disparity]**

177. Juarez incorporates all prior paragraphs of this Complaint and reasserts the

prior paragraphs herein.

178. This claim addresses Defendant's discriminatory treatment of Juarez concerning Defendant's conduct and decisions in paying him less than one or more White employees performing positions with the same title and equal or lesser skills.

179. Juarez belongs to a protected Title VII class because of his color.

180. Juarez identifies his color as Brown. He is non-White.

181. Kramer, a White male, is neither a member of Juarez's protected class nor a Title VII protected class.

182. Defendant, through Hensley, hired Kramer to work in the same position classification as Juarez and paid him an annual salary of $18,000.00 more than it paid to Juarez.

183. Juarez was qualified for his position, and he successfully performed his duties.

184. Defendant intentionally discriminated against Juarez because of his color by: (1) paying Kramer a salary greater than the salary Defendant paid to Juarez; (2) not investigating the pay disparity between Juarez and Kramer; and (3) not adjusting Juarez's salary to an amount equal to or above Kramer's salary.

185. Defendant's and Hensley's actions occurred under circumstances giving rise to an inference of discrimination.

186. To the extent Defendant has any justifications for the pay disparity between Juarez and Kramer, the justifications are unworthy of credence, and Defendant did not act for any asserted non-discriminatory reasons.

187. Defendant's treatment of Juarez constitutes (1) unlawful intentional discrimination based on color in violation of Title VII. 42 U.S.C. Section 2000e–2(a)(1)(2); and (2) intentional, unlawful discriminatory practices in violation of 42 U.S.C. Section 1981a (a)(1), (b)(2)(3), (d)(1) (2).

## FIFTH CLAIM
### [Color Discrimination: Terms and Conditions]

188. Juarez incorporates all prior paragraphs of this Complaint and reasserts the prior paragraphs herein.

189. Juarez's belongs to a protected Title VII class because of his color.

190. Defendant intentionally discriminated against Juarez because of his color by taking continual, intentional, cumulative, and increasingly severe, adverse, and discriminatory employment actions, including but not limited to the eighteen adverse employment actions in Juarez's First Claim for Relief.

191. Defendant took the adverse employment actions against Juarez because of his color.

192. Defendant's actions occurred under circumstances giving rise to an inference of discrimination.

193. Defendant's justifications for the adverse employment actions are unworthy of credence and did not act for any asserted non-discriminatory reasons.

194. Defendant's treatment of Juarez constitutes: (1) unlawful intentional discrimination based on color origin in violation of Title VII. 42 U.S.C. Section 2000e–2(a)(1)(2); and (2) intentional, unlawful discriminatory practices in violation of 42 U.S.C.

Section 1981a (a)(1), (b)(2)(3),(d)(1) (2).

## VI. **REQUEST FOR RELIEF**

WHEREFORE, Benjamin Juarez respectfully requests this Court to enter judgment in his favor and against Defendant on all claims asserted in this Complaint and Request for Jury Trial, and in addition, for the following relief:

(1)  To enter a judgment for Juarez and against Defendant, finding the acts of Defendant are continuing and intentional discrimination, as retaliation, in violation of Title VII.

(2)  To enter a judgment for Juarez and against Defendant, finding the acts of Defendant are continuing and intentional national origin discrimination in violation of Title VII.

(3)  To enter a judgment for Juarez and against Defendant, finding the acts of Defendant are continuing and intentional color discrimination in violation of Title VII.

(4)  To award Juarez the remedies of damages for back pay, restored benefits, actual monetary damages, loss of wages, salary, retirement contributions, all loss of income, and all loss of monetary damages to which he is entitled under Title VII.

(5)  To award Juarez compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future monetary losses, and all loss of compensatory damages to which he is entitled under Title VII.

(6)  To award Juarez reinstatement, or in the alternative, front pay, under Title VII.

(7)  To award Juarez attorney fees and costs under Title VII.

(8)  To award Juarez pre-judgment and post-judgment interest at the proper rate provided by law.

(9)  To direct Defendant to take such affirmative relief steps as are necessary to ensure the effects of Defendant's unlawful employment practices are eliminated and do not continue to affect Juarez's employment opportunities.

(10) To award Juarez all other legal and equitable relief to which Juarez is entitled under any law that this Court considers just, equitable, and proper.

## VII. JURY TRIAL REQUEST

Pursuant to Fed.R.Civ.P. 38 (a)(b)(c), 42 U.S.C. Sections 2000e-5, 2000e-6, 2000e-8, and 2000e-9, and 42 U.S.C. Section 1981a (a)(1), (b)(2)(3)(D), (c)(1)(2), and (d)(1)(A)(2), and all applicable laws providing for a right to trial by jury, Juarez requests a jury trial of all claims and issues.

Dated: February 13, 2023.

Respectfully submitted,

*/s/ Steven L. Murray*
Murray Law, LLC
3900 East Mexico Avenue, Suite 300
Denver, CO  80210
Telephone: (303) 396-9952
E-mail: steven@smurraylaw.com

Plaintiff's Address:
24352 East Alamo Drive
Aurora, CO  80016